**EXXON COMPANY, U.S.A., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, et al., Respondents.**

**Tesoro Alaska Petroleum Company, et al., Intervenors.**

**Nos. 95–1520, 96–1078, 96–1464, 97–1733, and 98–1005.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 30, 1999.

Decided July 13, 1999.

Rehearing and Rehearing En Banc Denied Sept. 15, 1999.*

---

tions for when the appeal is filed for purposes of F.R.A.P. 4.

* Chief Judge Edwards and Circuit Judges Wald, Silberman, Henderson and Garland did not participate in thsi matter.

Carter G. Phillips argued the cause for petitioner Exxon Company, U.S.A. With him on the joint briefs were Eugene R. Elrod, Stephen S. Hill, Stephen F. Smith, Robert H. Benna and Jeffrey G. DiSciullo. Clifton D. Harris, Jr., and Thomas M. Roche entered appearances.

Robert H. Benna argued the cause for petitioner Tesoro Alaska Petroleum Company. With him on the briefs was Jeffrey G. DiSciullo. James C. Reed, Jeanne M. Bennett and David S. Berman entered appearances.

Andrew K. Soto, Attorney, Federal Energy Regulatory Commission, argued the cause for respondents. With him on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, John J. Powers, III, and Robert J. Wiggers, Attorneys, Jay L. Witkin, Solicitor, Federal Energy Regulatory Commission, and Susan J. Court, Special Counsel. David H. Coffman, Attorney, entered an appearance.

John A. Donovan argued the cause for intervenors Arco Alaska, Inc., et al. With him on the brief were Matthew W.S. Estes, Bradford G. Keithley, Charles William Burton, Jason F. Leif, John W. Griggs, W. Stephen Smith, Randolph L. Jones, Jr., Alex A. Goldberg and Richard Curtin. Carolyn Y. Thompson, Richard D.

Avil, Jr., and Marvin T. Griff entered appearances.

Albert S. Tabor, Jr., John E. Kennedy and S. Scott Gaille were on the brief for intervenors TAPS Carriers. Dean H. Lefler entered an appearance.

Before: GINSBURG, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Exxon Company, U.S.A. and Tesoro Alaska Petroleum Company petition for review of the Federal Energy Regulatory Commission's ("FERC" or "Commission") order revising the valuation methodology for specified grades of petroleum products after our partial remand of the Commission's earlier order adopting the distillation method for determining compensation due shippers on the Trans Alaska Pipeline System for differences between the oil streams injected and oil streams received. *See* Order Modifying and Adopting Contested Settlement Proposal, Trans Alaska Pipeline Sys., 65 FERC ¶ 61,277 (1993) ("1993 Order"), *approved in part and remanded in part, OXY USA, Inc. v. FERC,* 64 F.3d 679, 684 (D.C.Cir.1995) ("*OXY*"). In the order before us, FERC approved with modifications a contested settlement over the objection of petitioners. We grant the petition for review in part and vacate and remand for further proceedings those parts of FERC's order approving the use of proxies for the market valuation of one grade of petroleum product and the decision to apply the settlement prospectively only.

## I. BACKGROUND

The Trans Alaska Pipeline System ("TAPS") provides the only commercially-viable method for moving crude oil pumped from the oil fields on Alaska's North Slope to the shipment point at Valdez, Alaska, the Alaskan gateway to the world market. Several oil companies own interests in various oil fields on the North Slope. The oil in those fields differs significantly in quality, but the realities of shipping that oil on the single pipe of the TAPS requires the blending of the oil streams from different fields. Unlike packages shipped by a common carrier, the oil streams cannot be segregated during shipping, and the blended streams cannot be separated at the Valdez end of the pipeline. Instead, at the Valdez end of the pipeline, each shipper receives a quantity of the blended common stream equivalent to the amount it injected at the North Slope end. Companies that inject higher quality crude receive oil at the Valdez end of the pipeline identical in quality to that received by companies that inject lower quality crude oil. The TAPS carriers file tariffs specifying how the shippers will compensate each other for these differences in quality, and their methodology must be approved by the Commission pursuant to its authority under the Interstate Commerce Act ("ICA"), 49 U.S.C.app. § 1 *et seq. See also* Department of Energy Organization Act, Pub.L. No. 95–91, § 402(b), 91 Stat. 565, 584 (1977), *codified at* 42 U.S.C. § 7172(b) (1988) (repealed 1994), *recodified as amended at* 49 U.S.C. § 60502 (transferring authority to regulate oil pipeline rates under the ICA from the Interstate Commerce Commission to FERC); *Exxon Pipeline Co. v. United States,* 725 F.2d 1467, 1468 n. 1 (D.C.Cir. 1984) (explaining transfer of authority). TAPS has created a system which requires companies injecting lower-quality oil to compensate companies injecting higher-quality oil by creating a "Quality Bank," which awards shippers credits for high-quality oil and debits for low-quality oil. The TAPS Quality Bank is an arrangement that "makes monetary adjustments [among] shippers in an attempt to place each in the same economic position it would enjoy if it received the same petroleum at Valdez that it delivered to TAPS on the North Slope." *OXY,* 64 F.3d at 684.

While this is simple enough in concept, determining the relative value of the injected streams is in fact a complex technical task. There is no independent market to set the relative price of the various streams of North Slope crude because the crude is not sold until after it is commingled and brought to Valdez. When the system was originally created, the relative value of oil was determined by the "API gravity"[1] of the oil because lighter, high-gravity crude is generally more valuable than heavier, low-gravity crude. *See id.* at 685. The "straight-line gravity method" measured the gravity of each incoming stream and compared it to the gravity of the oil received by that shipper at the far end, and determined Quality Bank credits or debits accordingly. *See id.* In 1989, however, OXY USA and Conoco, Inc. challenged this methodology, and in 1991 a FERC Administrative Law Judge ("ALJ") determined that it "no longer yield[ed] a just and reasonable result." 57 FERC ¶ 63,010, at 65,049–50, 65,052–53 (1991). (For a full explication of the proceedings, see OXY, 64 F.3d at 683–89.)

The majority of North Slope shippers in an attempt to settle the tariff dispute proposed abandoning the straight-line gravity method in favor of a "distillation" or "assay" methodology, which would value crude oil based on the market price of the various component products (called "cuts") created when the crude oil is heated to a series of specific temperatures and the evaporated products produced at each temperature are recondensed. *See OXY,* 64 F.3d at 687. The five cuts created by this process at the lower boiling points—propane, isobutane, normal butane, natural gasoline, and naphtha—and one of the heavier cuts, gas oil, are not at issue here, as we upheld the method of valuing those cuts in our earlier review. *See id.* at 701. We vacated and remanded for further proceedings as to distillate and residual fuel oil ("resid").

### A. Distillate

Under the original 1993 settlement offer, the distillate cut included the portion of the stream that evaporated between 350 and 650 degrees Fahrenheit. Under the 1993 settlement order, FERC split this proposed cut into two cuts, light distillate (350–450 degrees) and heavy distillate (450–650 degrees). FERC determined that it would price light distillate as jet fuel and heavy distillate as No. 2 fuel oil, the products into which those cuts are normally refined, without adjustment for processing costs. *See* 1993 Order, 65 FERC ¶ 61,277, at 62,288. We rejected that methodology because each cut would require further processing to reach the quality required for the proxy product. *See OXY,* 64 F.3d at 693. Because the settlement as modified by FERC essentially valued a raw material as if it were a finished product, we determined that it overvalued these heavier cuts, resulting in a windfall to those shippers whose streams contained the highest relative proportion of heavy crude. *See id.* Although we recognized that we could not require FERC to achieve a perfect method of valuing petroleum streams, particularly streams including cuts without a market, we nonetheless held that FERC must be consistent in its methodological choices. That is, if the Commission chose to value a portion of the cuts at market without adjusting for processing costs, then it must, at least "to the extent possible," attempt to approximate the market value of other cuts without processing. *Id.* at 694. That is, the Commission cannot "consistent with the requirement of reasoned decisionmaking, value some cuts precisely and others haphazardly." *Id.* We therefore remanded the distillate valuation for further consideration by FERC.

### B. Resid

As the name implies, the residual, or "resid," cut consists of the portion of the

---

1. API gravity is a measure of density created by the American Petroleum Institute. Under API gravity analysis, unlike the more familiar concept of specific gravity, a higher number indicates a less dense crude oil or petroleum product.

petroleum stream remaining after distillation of all other cuts at lower boiling points. In the 1993 settlement order, FERC split the resid into two cuts—light resid (1,000 to 1,050 degrees Fahrenheit) and heavy resid (all remaining material). The order valued these cuts in relation to the market price of proxies: No. 6 fuel oil for light resid and FO–380 for heavy resid with no adjustment for the processing necessary to receive these market prices. We upheld FERC's decision to create a separate light resid cut, but vacated the valuation of that cut at the price of No. 6 fuel oil as we found that the record did not disclose a relationship between the price of that purported proxy and the value of the cut. Likewise, we concluded that the record did not demonstrate that FO–380 was a reasonable proxy for heavy resid because the market price of FO–380 bore only a limited and unquantified relation to the value of heavy resid as a blending component. *See id.* at 695. While we concluded that expert testimony in the record supported a "conclusion that FO–380 and the 1050+ resid share some physical properties," it did not even suggest that "the two materials have equal or even near-equal market values." *Id.* We therefore remanded the valuation of the resid cuts to the agency for further proceedings consistent with our opinion.

In our review of FERC's order approving the 1993 settlement, we rejected not only the specifics of the FO–380 comparison, but also FERC's decision to value resid based on its use as a feedstock for "cokers," refinery equipment which breaks resid down even further into lighter fuel products and a heavy residue, which might be asphalt at some plants, or other materials with differing uses. Exxon and others argued that resid should be priced at its marginal use value, which Exxon claimed was as a blending component for FO–380. When remanding, we observed that this

economic argument, while it might not by itself carry the day, did possess enough "analytical force" that the Commission should on remand "explicitly address whether the marginal use of 1050+ resid should be taken into account in that cut's valuation methodology." *Id.*

## C. FERC's Proceedings on Remand

In response to our opinion, FERC initiated settlement proceedings regarding these remanded issues. When this effort failed, FERC set the matter for hearing. At the same time, the Commission's Chief ALJ made further attempts to secure a settlement. The parties filed three separate settlement proposals, one by nine parties[2] ("the Nine Party Settlement"), and unilateral proposals from Exxon and Tesoro. The ALJ provided opportunity for all parties to file materials in support of or in opposition to the settlement offers. Following the submissions, the ALJ heard oral argument and the parties filed supplemental briefs. *See* Certification of Contested Settlement and Ruling on Motion to Omit the Initial Decision, *Trans Alaska Pipeline Sys.,* 80 FERC ¶ 63,015, at 65,-212–13 ("1997 Opinion").

The ALJ ultimately certified the Nine Party Settlement to the Commission, and opted not to certify the unilateral proposals from Exxon and Tesoro, finding that legal precedent required this decision and that in any event the proposals were biased in favor of the proposing parties. The ALJ reviewed the record in detail and determined that the only issues properly before him were the remands for valuation of light and heavy distillate and light and heavy resid. He found that the Nine Party Settlement's proposed valuations, which follow, were fair and reasonable and supported by record evidence. *See* 1997 Opinion, 80 FERC ¶ 63,015, at 65,233.

---

**2.** The nine settling parties are Amoco Production Company, ARCO Alaska, Inc., BP Exploration (Alaska), Inc., MAPCO Alaska Petroleum, Inc., OXY USA, Inc., Petro Star, Inc.,

Phillips Petroleum Company, the State of Alaska, and Union Oil Company of California. *See* 1997 Order, 81 FERC ¶ 61,319, at 62,458 n. 5.

**Light distillate:** valued based on a weighted average of the West Coast and Gulf Coast prices of jet fuel, adjusted by 0.5 cents per gallon to reflect processing costs.

**Heavy distillate:** valued based on weighted average of the West Coast price of Waterborne Gasoil, reduced by 1 cent per gallon to reflect processing costs and the Gulf Coast price of No. 2 fuel oil reduced by 2 cents per gallon to reflect processing costs. (The processing costs were based on the testimony of Nine Party expert witness John O'Brien who stated that ANS crude oil needed to be processed to reach the 0.5 percent level for sulfur demanded by the market. )

**Light resid** (1000 degrees F to 1050 degrees F): The 1993 settlement had eliminated separate treatment of light resid and combined it with the 1050+ cut. The Nine Party Settlement approved by the ALJ instead rolled it into the Vacuum Gas Oil ("VGO") cut, by raising the top end of that cut to 1050 degrees, which the nine parties claim conforms with industry practice.

**Heavy resid** (1050+): continued use of the West Coast price of FO–380 as a West Coast reference price, subtracting 4.5 cents per gallon as a processing cost. Added Gulf Coast 3 percent sulfur No. 6 fuel oil as a Gulf Coast reference product, and adjusted that figure by the same 4.5 cents.

The ALJ noted that the nine parties supported the settlement only if it applied prospectively. *See id.* at 65,241. The ALJ determined that the remand did not require that the new methodology be applied retroactively and that the Commission retained the discretion to determine when to make the settlement effective. *See id.* at 65,243. The ALJ also recommended prospective application under the circumstances. *See id.*

The Commission reviewed and accepted the ALJ's recommendations as to each valuation, finding in its order that each determination was based on substantial evidence. FERC found that there was no active market for resid, and opted to price resid based on its value as a coker feedstock. FERC determined that the two reference products were the actively-traded petroleum products that had physical characteristics most resembling resid, and used these adjusted prices as a proxy for the value of resid as a coker feedstock. It also decided to apply the new rates prospectively, stating that this was consistent with the 1993 Order applying the new rates prospectively, which was affirmed by this court in *OXY.* "[The new settlement] does not change the methodology to be used, but modifies how to value the remanded cuts." *See* 1997 Order, 81 FERC ¶ 61,319, at 62,467. The Commission noted that the TAPS Quality Bank was *sui generis,* so precedents cited by Exxon and Tesoro as supporting retroactive application of the new methodology were not dispositive.

## II. STANDARD OF REVIEW

■ The standard of review applicable to FERC's approval of this proposed settlement of the issues remaining on remand is the same as it was in *OXY.* FERC's decision to approve a portion of a contested settlement must be supported by substantial evidence, and we must set aside FERC's approval if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (E). Our inquiry under the arbitrary and capricious test is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Where, as in the instant case, the analysis to be performed "requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)

(internal quotation marks omitted). Nonetheless, the Commission must engage in rational decisionmaking, *see, e.g., State Farm*, 463 U.S. at 43, 103 S.Ct. 2856; *OXY*, 64 F.3d at 690. We held in *OXY* that the agency had supplied a reasoned analysis for changing its prior policies when it adopted the distillation methodology. *See OXY*, 64 F.3d at 690. However, more important for purposes of the petitions now before us, we granted the petitions for review of the 1993 Order to the extent that they challenged the Commission's methods of valuing the distillate and resid cuts.

## III. CHALLENGES TO THE NEW SETTLEMENT

The petitioners make multiple arguments challenging the valuation of specific cuts and FERC's failure to require that qualitative differences between the same cuts of different streams be considered when determining the relative value of each stream. They argue that FERC acted arbitrarily by failing to value resid based on its marginal use as a fuel oil blendstock instead of as a coker feedstock; improperly failed to account for differences in quality among the same cuts of different streams when valuing resid; improperly chose a price proxy for its value as a coker feedstock; and failed to address challenges to the methodology for determining resid's value as a coker feedstock. The petitioners also challenge FERC's decision to implement the new valuation methodology prospectively only. We address first the valuation challenges, and uphold the agency's decisions as supported by substantial evidence with the exception of the use of FO–380 less 4.5 cents and 3 percent sulfur No. 6 fuel oil less 4.5 cents as proxy prices for heavy resid. The adjusted valuation solves none of the problems we identified in our prior opinion because there is no evidence that the prices of the reference products, even after the 4.5 cents adjust-

ment, bear any rational relationship to the market value of resid. We therefore vacate and remand the portion of FERC's order affecting the valuation of heavy resid.

## IV. INTRA–CUT QUALITY DIFFERENCES

■ Exxon[3] argues that FERC's failure to account for differences in quality among the heavy distillate cuts of the individual streams before they are commingled in the TAPS common stream violates the terms of our earlier remand in *OXY*, and is arbitrary and capricious. We disagree.

Petitioners claim that the goal of the Quality Bank is to place an accurate value on the streams flowing into the TAPS, and failure to account for quality differences in the distillate cuts of the streams coming from different oilfields is not reasoned decisionmaking. We disagree that Exxon's argument follows logically from our remand. In *OXY*, we recalled that the goal of the Quality Bank is "to assign accurate *relative* values," 64 F.3d at 693 (emphasis added), to the diverse streams delivered to the pipeline. We vacated in part the last order because the methodology approved therein had favored one class of cuts above others. We remanded in order that FERC might provide a methodology with a reasoned relative uniformity, knowing that absolute precision at any level of the cuts was unachievable. That is, we did not remand because the old method was inaccurate, but because it was unfairly nonuniform. To have demanded 100 percent accuracy would have been to hold the agency to "an impossibly high standard." *Id.* at 694. The specific purpose in our remand was to require the agency to resolve the relative overvaluation of some cuts, which were valued at the market price for their proxy despite the fact that significant processing was required to bring those products up to a market standard. Exxon

**3.** Exxon and Tesoro filed a joint petition for review. For simplicity's sake, we will refer to the joint arguments of the two petitioners as Exxon's arguments.

seeks to expand the duty of the Commission to refining the degree of distinction among component streams within individual cuts. Specifically, Exxon seeks to have us vacate FERC's order insofar as it does not recognize and adjust for differences in the sulfur content of distillate as a key factor in determining market value. Part of the adjustment to the per-barrel price of distillate is to account for removing sulfur so that it can be sold as jet fuel or No. 2 fuel oil. In implementing that methodology, FERC assumed that all streams had the same sulfur content, when Exxon had shown that such was not the case. Exxon argues that FERC should not use the sulfur content of the commingled streams when determining the value of the cut, but must determine the sulfur content and thus the value of the distillate cut of the oil from each field before it enters the common stream. Because some streams have a higher sulfur content, they would require more processing and consequently have a lower value once processing costs were factored into the per-barrel price. Other streams with a lower sulfur content would have a higher value because no further processing would be needed to bring the oil up to the quality of the proxy product.

Exxon further argues that treating all of the streams as if they have the same sulfur content violates *OXY*, which calls for accurately valuing the streams; that it is arbitrary and capricious because it makes assumptions contrary to fact; and that FERC's failure to even consider the issue is arbitrary and capricious. Specifically, Exxon argues that FERC improperly determined that the scope of its actions was limited by the terms of our remand, but that in any event, FERC cannot claim that it addressed only the issues required by the court because it did more than we ordered when it changed the West Coast proxy for heavy distillate, even though no party challenged the one adopted in the 1993 and 1994 orders, and eliminated the light resid cut, even though it was affirmed in *OXY*. Exxon contends that having opened the door, so to speak, FERC was

obligated to consider the information provided by Exxon and Tesoro about the differences in quality among the streams because it has an obligation under the ICA " 'to ensure that pipeline rates are just and reasonable.' " *OXY*, 64 F.3d at 690 (quoting *Texas Eastern Transmission Corp. v. FERC*, 893 F.2d 767, 774 (5th Cir.1990)). Exxon argues that refusing to consider the quality differences was therefore arbitrary and an abuse of discretion. In its 1997 Order, FERC noted that it had rejected the same argument in its 1993 Order, and that we had not reversed or vacated that ruling. Exxon argues nonetheless that by adjusting the market prices of the proxies to account for removing sulfur, FERC itself has now determined that sulfur content is an important aspect of valuing heavy distillate.

We reject Exxon's argument that FERC's failure to differentiate between the streams was arbitrary and capricious. In *OXY*, we required FERC to take into account the significant processing costs that rendered its unadjusted use of a proxy product unreasonable in relation to the valuation of other portions of the stream. Exxon's contention that FERC must value each stream at the wellhead based on its individual sulfur content calls for more than we required. We did not hold in *OXY* that differences in quality between the streams must be considered, and do not do so now. Inherent in our approval of FERC's adoption of the distillation methodology in *OXY* was our approval of the agency's conclusion that there was no need to consider intra-cut quality differences, and that the agency properly determined that the relative proportions of the cuts in each stream is sufficiently accurate as a method of determining the relative value of the streams. *See* 65 FERC ¶ 61,277, at 62,287 (1993), and 66 FERC ¶ 61,188, at 61,240 (1994). In any event, it was not arbitrary and capricious to determine the value of each cut in the TAPS stream after it has been mixed, instead of separately valuing the

cuts of each stream. The fact that a more precise method exists for determining the relative value of the streams does not render the decision to adopt a less accurate, but more administrable, method arbitrary and capricious. FERC has opted to use a magnifying glass to determine the values of the streams, and we will not fault it for not using a microscope.

■ We also uphold against challenge FERC's two changes to the price of heavy distillate, both of which are supported by the record. FERC changed the reference price for the West Coast from No. 2 fuel oil to Waterborne Gasoil, and adjusted the price of Waterborne Gasoil by one cent per gallon and the Gulf Coast price of No. 2 fuel oil by two cents to account for processing. *See* 1997 Order, 81 FERC ¶ 61,-319, at 62,460. These adjustments were based on the testimony of expert witnesses John O'Brien and Christopher Ross. Ross testified that these products most closely resembled Alaskan North Slope ("ANS") heavy distillate, *see* Affidavit of Christopher E. Ross, ¶ 19 (Jan. 29, 1997), and O'Brien testified that the ANS heavy distillate cut required treatment to reach the necessary sulfur level, *see* Affidavit of John O'Brien, ¶¶ 13–15 (Jan. 28, 1997). These decisions were supported by adequate record evidence and we uphold the agency.

## V. RESID CUT VALUATION ISSUES

### A. Exxon and Tesoro's Challenges

In *OXY,* we noted that resid like distillate did not trade on an open market and therefore was difficult to evaluate. Nonetheless, and even in the face of "the deference we owe the Commission's judgments," we concluded that the 1993 settlement approach to valuation of resid did not "satisfy the APA's basic requirement of reasoned decisionmaking." *OXY,* 64 F.3d at 694 (citing *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856). We therefore remanded that portion of the assay methodology to the Commission for further consideration.

The method before us in the present review fares no better than the last, and for the same reasons: even with the 4.5 cents per gallon adjustment, "the record demonstrates no more than that the price[s] of FO–380 [or No. 6 fuel oil] bear[ ] some remote relationship to the value of 1050+ resid as a feedstock." *Id.* at 695. We remand FERC's decision to value resid at the price of FO–380 less 4.5 cents on the West Coast and Waterborne 3% sulfur No. 6 fuel oil less 4.5 cents on the Gulf Coast. The figures derived from the use of these proxies with a subsequent adjustment do not bear a demonstrated relationship to the value of resid, either as a coker feedstock or as a blending agent for fuel oil. Exxon and Tesoro raise multiple challenges to FERC's valuation process for this cut.

### 1. Marginal Use

■ Exxon argues that FERC erred again, as it did in the 1993 Order in not employing the marginal use of resid as a blending agent for fuel oil rather than its value as coker feedstock in establishing the valuation methodology for that cut. Exxon contends that the error is a fundamental one in that the ALJ's finding, adopted by the Commission, that there is no active market for resid is flawed. In Exxon's view, although there are few trades of resid, there is in fact a market, and a sparsity of open trades is only due to the fact that the refiners who use resid rarely need to purchase it from others because they already obtain it as a byproduct of their own refining operation. Exxon further argues that there are formulae that can be used to derive resid's value as a blendstock despite the absence of market trades. Thus Exxon prays the court to vacate the relevant portion of FERC's order and remand the controversy for valuing of resid as a blendstock.

FERC responds that there was conflicting evidence regarding the existence of a market for ANS resid, and the ALJ and the Commission reasonably adopted the

testimony of Nine Party witnesses A.L. Gualtieri and Benjamin Klein, who testified that resid was rarely traded, and was instead used as a coker feedstock. *See* 1997 Opinion, 80 FERC ¶ 63,015, at 65,-238–41. The ALJ also determined, based on the record, that it was inappropriate to value resid based on its marginal use as fuel oil blendstock because most of the refineries did not seek to purchase resid but created it as part of their refinery process. *See id.* 65,240. The absence of an active market for resid made the economic principle of marginal use, which depends on a liquid market, unreasonable in this circumstance. *See id.* 65,240–41.

We see no reason to disturb FERC's adoption of the ALJ's determination that resid is best valued based on the market value of its constituent products. The expert testimony of Klein constitutes substantial evidence in support of FERC's decision that marginal use analysis does not require the valuation of resid as a blendstock.

### 2. Conradson Carbon Residue Content

■ As with distillate, Exxon argues that FERC arbitrarily ignored quality differences in the streams which affect the value of the different cuts. The Conradson Carbon Residue Content ("CCR") of resid affects its value, and the different streams delivered to the TAPS undisputedly have differing CCR content. Exxon reiterates the argument it made concerning sulfur that failing to account for differing CCR content was arbitrary and capricious. The CCR content figure used by FERC was not even derived from the oil shipped over TAPS, but from a blend used by an expert which included other crude oils. FERC responds that it properly rejected the suggested intra-cut differentials based on CCR content for the same reasons it rejected the quality differentials based on sulfur content. For the reasons stated in Parts III and IV above, we hold that FERC was not required to consider intra-cut differences in CCR content when determining market value.

### 3. Choice of Proxies

■ Exxon next argues that FERC acted arbitrarily when it chose to use the adjusted price of FO–380 as a proxy for valuing resid as a coker feedstock. In *OXY*, we found that using the unadjusted market price of FO–380 as a proxy was arbitrary and capricious. The 4.5 cents adjustment now adopted is arbitrary for the same reasons. There is no demonstrated relationship between the value of FO–380 and coker feedstock other than an observed rough correlation in price, and even the data relied on by FERC shows inconsistent relationships in the price of FO–380 and the coker feedstock values calculated by the experts. Exxon argues that determining resid's value as a coker feedstock "requires determining the identity, quantity, and value of products produced in a coker from resid *and* subtracting from the value the costs of producing those products and placing them in a marketable condition." *See* Joint Brief of Petitioners Exxon Company, U.S.A. and Tesoro Alaska Petroleum Company at 42. Exxon also argues that FERC chose the wrong feedstock to value because it used a blend of crudes which would be used by a hypothetical refinery, rather than actual individual North Slope crude streams. Exxon further contends that it presented numerous challenges to the methodology ultimately adopted by FERC, showing inaccuracies in the expert's assumptions regarding cost calculations, product outputs and product yields. Finally, it argues that because the ALJ never allowed discovery, it could not replicate the expert's computer modeling on the PIMS system (a standardized petroleum industry modeling system used to calculate refinery needs and outputs). The ALJ and the Commission did not specifically address these arguments, which Exxon contends makes their decisions arbitrary and capricious.

FERC responds that the 4.5 cents per gallon adjustment to the price of FO–380 on the West Coast and No. 6 fuel oil on the Gulf Coast as proxies for resid was reasonable, based on expert witness O'Brien's testimony and administrative ease. These are the lowest-quality products actively traded, and the adjustment was within the range of variation between the calculated value of resid as a coker feedstock and the per-gallon price of FO–380. *See* Ross Affidavit ¶ 21. O'Brien derived the calculated value of resid as a coker feedstock using the PIMS model and compared those calculated values to the market price of FO–380 over the same five-year period. The relationship varied from resid being worth $1.21 per barrel more than FO–380 in 1993 to being worth $3.01 per barrel less than FO–380 in 1995, and averaged being worth $1.12 per barrel less over the five-year period. *See* 1997 Opinion, 80 FERC ¶ 63,-015, at ¶ 65,239 (citing O'Brien Affidavit ¶¶ 56–598 Exhibit QB ar–23). O'Brien testified that the 4.5 cents per gallon adjustment (equal to $1.89 per barrel less than FO–380) proposed by the Nine Party Settlement fell within the observed range of variation over the five-year period and was therefore reasonable. *See id.* FERC also notes that Exxon and Tesoro both suggested a method that tied the price of heavy resid to FO–380. The difference is that Exxon uses a complex formula to adjust the price.[4]

### B. Analysis

While we find substantial record evidence supporting the intermediate steps FERC took in determining the value of resid—i.e., its determinations that no active market exists, that resid is best valued as a coker feedstock rather than as a blender for fuel oil, and that FO–380 and No. 6 fuel oil are the actively-traded products in the relevant markets most similar in physical characteristics to resid—we cannot conclude that the last step follows logically from these premises. We therefore cannot uphold the use of FO–380 less 4.5 cents on the West Coast and Waterborne 3% sulfur No. 6 fuel oil less 4.5 cents on the Gulf Coast as a proxy price for resid.

The 4.5 cents adjustment, while it falls within the range of the observed variation, does no more than that. There is no evidence that the prices of the proxy products are more than coincidentally related to the value of resid as a coker feedstock. Moreover, the calculated value of resid using the PIMS model does not even vary consistently with the price of FO–380. As petitioners noted when this case was before us in *OXY*, by the same logic we could use the price of coal with an adjustment as a proxy for the price of diamonds because both are a source of carbon, even if the prices fluctuate inconsistently. With only five years' data to consider, the sample is too small to convince us that there is some other, unstated relationship at work which guarantees that the price of FO–380 and the value of resid will correlate consistently within some specified range. We recognize that the agency is addressing the Quality Bank Administrator's concerns that more complex systems may give the appearance that the price of resid is open to manipulation, and thus is seeking a product that is traded on the market to use as a proxy, which would allow the Quality Bank Administrator to perform a simple market-based calculation when determining the value of resid. These goals of administrative efficiency and objectivity do not free the agency from the requirement that the chosen proxy bear a rational relationship to the actual market value of resid. We remand once again to the agency to determine a logical method for deriving a value for resid. Because we remand, we do not reach the technical objections

---

4. FERC's suggestion that Tesoro and Exxon somehow validated their choice of FO–380 as a reference product is misleading because Exxon and Tesoro's use of FO–380 as a reference price ties the value of resid to the value of FO–380 when valuing resid as a blendstock for fuel oil, not as a coker feedstock.

Exxon and Tesoro raise regarding specific calculations.

## VI. TESORO'S INDEPENDENT CHALLENGES

### A. Tesoro's Standing

■ In addition to the arguments raised jointly with Exxon, Tesoro raises numerous additional challenges to FERC's decision. However, before we address the arguments raised by Tesoro in its individual brief, we must consider as a threshold matter whether Tesoro has standing to petition us for review. Intervenors argue that Tesoro lacks standing because it is no longer a shipper on the TAPS system and therefore no longer has a legally cognizable stake in the outcome. As a result, they argue, the case is moot as to it and issues raised only by Tesoro are not properly before us. Intervenors also argue that because Tesoro passed its Quality Bank costs through to its shippers, it was not aggrieved by the orders under review.

Tesoro counters that it has standing as a competitor of MAPCO, one of the shippers on the TAPS system, which is subsidized by TAPS because its stream is overvalued. We have held that even non-shippers and competitors may be within the ICA's zone of interest. *See OXY,* 64 F.3d at 697. Tesoro also notes that it currently purchases ANS crude from one supplier and hopes to acquire more from another. Tesoro Reply Brief at 19 n.10.

■ The Intervenors are correct that only "aggrieved" parties may seek judicial review of a final FERC order issued under the ICA. *See* 28 U.S.C. § 2344; *OXY,* 64 F.3d at 696; *Shell Oil Co. v. FERC,* 47 F.3d 1186, 1200 (D.C.Cir.1995). We use traditional standing principles to determine if a party is indeed aggrieved. *See OXY,* 64 F.3d at 696; *Water Transp. Ass'n v. ICC,* 819 F.2d 1189, 1193 (D.C.Cir.1987). To be aggrieved, Tesoro must have suffered an "injury in fact" traceable to FERC's action, a decision in its favor must be capable of redressing that injury, and

its interest must be within the zone of interests protected by the statute. Tesoro has shown that it would suffer competitive injury if other shippers were advantaged by unfair Quality Bank valuations, a decision on our part altering those valuations would redress that injury, and the ICA permits a very broad range of parties to complain to FERC about pipeline operations. The ICA permits the Commission to respond to complaints about "anything done or omitted to be done by any common carrier" subject to the statute lodged by, *inter alia,* "[a]ny person, firm, corporation, company, or association." 49 U.S.C.app. § 13(1). Tesoro has standing to challenge the decision here.

### B. Tesoro's Position

Tesoro marshals additional attacks on FERC's approval of the settlement, some technical and some that are arguably procedural.

#### 1. Considering Processing Costs for Only Two Cuts

■■ Tesoro argues that FERC erred in singling out the light and heavy distillate cuts for processing cost calculations when processing costs associated with other cuts are ignored. It argues that this violates the requirement in *OXY* that streams be valued equally. In *OXY* we remanded the light distillate and heavy cuts for new valuation because further processing was required before they could be sold as jet fuel and No. 2 fuel oil respectively. Tesoro now claims that FERC arbitrarily ignored the question of whether further processing was needed before the other cuts could be sold as the proxy products FERC used to value them. Failing to do so, it claims, skews the valuation in favor of the heavier streams. This argument fails to comprehend our earlier opinion. There we upheld the agency's finding that the lighter cuts were of sufficiently comparable quality to the market proxies that no further processing was needed, and therefore no cost adjustment was

needed. Essentially, the market price was correct because in those instances the distillation method resulted in a market-ready product. We will not reexamine this issue now. For the reasons given above in Parts III, IV, and V.A.2, we do not entertain the argument that quality differences between the streams must be considered at this stage.

### 2. Costs of Sulfur Removal

■ Tesoro argues that internal inconsistencies in the Nine Party data show that the processing costs for sulfur removal are not credible, specifically because there is a higher per-unit cost to remove sulfur from heavy distillate than from resid. Tesoro presented evidence challenging these calculations, which the ALJ and FERC failed to fully address.

FERC responds that Tesoro's argument that there are inconsistencies in O'Brien's cost calculations for sulfur removal was never raised before the Commission, and cannot be raised now before the court. If the issue was preserved, the agency argues that Tesoro has produced no evidence showing that the calculations are incorrect, and that the agency could reasonably have adopted O'Brien's calculations.

We hold that Tesoro preserved this issue for review when it argued before the Commission that there was "no way, absent discovery, to determine that O'Brien's cost estimates are not totally arbitrary" and that the conflicting testimony of its experts supported a lower cost per unit for removing sulfur. Motion of Tesoro Alaska Petroleum Company for Expedited Reconsideration and Remand or to Permit Appeal Concerning Certification of Nine Party Settlement ¶¶ 36–37 (Oct. 15, 1997). As for the merits of the issue, we hold that FERC reasonably relied on the testimony of Nine Party witness O'Brien in reaching the adjustment. Witness O'Brien testified that different methods would be needed to bring the two products into compliance. Heavy distillate could be blended with a lighter product to bring it into compliance

with the 0.5% market tolerances for sulfur in West Coast Waterborne Gasoil, the reference product on the West Coast. However, such blending would not be economically feasible to bring it down to the 0.2% sulfur content of Gulf Coast No. 2 fuel oil, the Gulf Coast reference product, so it would have to be processed to remove the excess sulfur. See 1997 Opinion, 80 FERC ¶ 63,015, at 65,234; O'Brien Affidavit ¶¶ 13–15. This difference in approach accounts for the difference in cost. Thus, there is no inconsistency warranting the relief Tesoro seeks.

### 3. Processing Costs for Light Distillate

■ Tesoro argues that FERC arbitrarily and capriciously accepted the Nine Parties' processing cost adjustment for light distillate. Tesoro argues that its expert testified that no further processing was required for light distillate to meet the requirements for jet fuel, the proxy product used for valuation of the light distillate cut. FERC arbitrarily accepted the Nine Parties' experts' claims that 0.5 cents per gallon in processing was required before the cut would meet the standard. Tesoro also argues that its expert pointed out unreasonable additions to the cost of the processing, such as unnecessary pumping and inflated administrative costs, and that FERC accepted this flawed estimate without considering contrary evidence and thus failed to satisfy the substantial evidence standard. We find this objection to be without merit. There is substantial record support for the Commission's determination that a 0.5 cent/gallon adjustment was required to account for the processing of light distillate into jet fuel. That evidence consisted of expert testimony before the ALJ by Nine Party witness O'Brien supporting the processing costs figures eventually adopted by the ALJ and thereafter by the Commission. See Reply Comments of the Nine Settling Parties in Support of the Nine Party Settlement at 4–5 (Mar. 17, 1997).

**4. Coker Feedstock Value Based on Improper Assumptions and Calculations Not in the Record**

Tesoro next argues that FERC ignored substantial and important criticism of the coker valuation of resid. Under the adopted method, resid's coker feedstock value is deemed to be the value of the products created less the cost of processing. Tesoro argues that the other experts' opinions were based on the wrong mix of product yields, that the PIMS model used is not in the record, and that Tesoro's expert could not replicate the results. Tesoro also argues that its expert showed that the coker operating costs used by the Nine Parties' experts were overstated. Because the PIMS model is not in the record, FERC could not make a rational connection between the facts and the conclusions drawn therefrom.

Given that we are remanding the question of valuation of resid because FERC has not provided a reasoned explanation for its determination to set resid's value as a coker feedstock and to use FO–380 less 4.5 cents on the West Coast and Waterborne 3% sulfur No. 6 fuel oil less 4.5 cents on the Gulf Coast as a proxy price, we need not decide this detailed factual question, as the factual record may change on remand. FERC will necessarily address these issues when it revalues resid, and such complex technical questions belong first to the informed discretion of the agency. *See OXY,* 64 F.3d at 691.

**5. Eliminating the Fuel Oil Cut**

■ Tesoro argues that FERC improperly eliminated the light resid cut and determined that the 1000–1050 degree cut should be valued as VGO. (We had previously affirmed FERC's creation of the light resid cut, but had remanded for new valuation.) The Nine Parties had suggested this change, and FERC approved it. Tesoro argues that the new cut is beyond the capability of many refineries. It suggests that the ALJ was confused when he determined that this change was consistent with the Commission's treatment of this cut.

FERC reasonably found, in resolving this technical matter, that the record evidence supports a determination that "the standard industry cut point shown on assays is 1050°, and that the published specifications for VGO permit cut points to 1100°." *See* 1997 Order, 81 FERC ¶ 61,-319, at 62,464. This finding, coupled with the testimony of expert witness O'Brien, *see id.* at 65,236–37, provided substantial evidence supporting the agency's decision that VGO is a permissible product on which to base the valuation of 1000 to 1050 degree resid.

**6. The Choice of Waterborne Gasoil**

■ Tesoro argues that FERC arbitrarily and capriciously approved the Nine Parties' selection of Waterborne Gasoil as the proxy product for valuing West Coast heavy distillate. Tesoro argues that Waterborne Gasoil is not a West Coast product, but is a Singapore product created in Singapore and is thus subject to Far East refining and market economics. This, it argues, is inconsistent with the stated goal of the settlement of valuing the product on the coast where it is "delivered and used." Waterborne Gasoil, a high-sulfur product, cannot be sold on the West Coast. *See* Tesoro Brief at 19–21.

The agency states that "the reference price used is 'Platt's U.S. West Coast spot quote for Waterborne Gas oil less 1 cent per gallon for processing costs.' ... That quoted Platt West Coast Waterborne Gas Oil price represents the value of significant Gas oil transactions on the United States West Coast." 1997 Order, 81 FERC ¶ 61,319, at 62,463–64. Witness Ross stated that the price for Waterborne Gasoil was a West Coast price, even if the product was ultimately exported to Singapore. *See* Affidavit of Christopher E. Ross ¶¶ 7–10 (Mar. 17, 1997). Given this record support, we will not disturb FERC's determination.

### 7. Inconsistent Treatment of Heavy Distillate and Resid

Tesoro also argues that the valuation of heavy distillate is inconsistent with the valuation of resid. West Coast heavy distillate is valued based on its marginal use as the lowest-value product requiring the least processing (high sulfur Waterborne Gasoil), whereas resid is valued based on its highest-value use as a coker feedstock. Tesoro argues that this impermissible inconsistent treatment overvalues the heaviest streams. This amounts to a reiteration of the question addressed above regarding FERC's determination that it is appropriate to value resid as a coker feedstock in the absence of a liquid market for the product. We uphold FERC's decision for the reasons stated above in Section V.A.1.

### 8. Naphtha and Gas Oil

Tesoro argues that FERC should have reevaluated other cuts, particularly naphtha and gas oil. Specifically, Tesoro argues that FERC failed to value these two cuts based on a weighted valuation of the prices on both the West Coast and Gulf Coast, which violates the "dual-market principle." *See* Brief of Petitioner Tesoro Alaska Petroleum Company at 22. None of these products are valued based on Gulf Coast prices, which overvalues gas oil and undervalues naphtha, thus favoring heavy streams. Whatever the merits of these arguments might be, the issues they raise are beyond the scope of the limited remand, and therefore not properly before us.

### C. Procedural Questions

█ Tesoro next argues that FERC arbitrarily and capriciously failed to provide for adequate procedures to ensure a reliable record. Specifically, Tesoro argues that FERC should have ordered discovery and hearings with cross-examination to resolve contested issues because of the vastly differing positions of the experts. Live hearings would have permitted the ALJ to make credibility determinations, and cross-examination would have permitted Tesoro to challenge specific portions of the experts' testimony. For instance, Tesoro objects that the PIMS computer model is not in the record, and thus the assumptions underlying the coker feedstock valuations could not be tested,[5] and argues that some of the Nine Parties advocated higher payments into the Quality Bank earlier in the litigation. Tesoro cites *Astroline Communications Co. Ltd., Partnership v. FCC,* 857 F.2d 1556, 1571 (D.C.Cir.1988); *Porter v. Califano,* 592 F.2d 770, 783 (5th Cir.1979); and *Xerox Corp. v. Genmoora Corp.,* 888 F.2d 345, 355 (5th Cir.1989), as establishing the principle that review of a contested settlement on the merits requires discovery and cross-examination.

FERC responds that the procedures employed by the ALJ provided ample opportunity for the parties to advance all supporting evidence for their proposals and to illuminate defects in the counter proposals. Specifically, the ALJ permitted the parties to file affidavits and other materials in support of the proposals; the ALJ heard oral arguments from all parties in support of the proposals; the ALJ further permitted the parties to file post-argument briefs. FERC contends that these opportunities were adequate to fulfill all due process requirements and allowed the parties to adequately present their positions to the ALJ and the Commission. We agree.

While it is true that live testimony and cross-examination can facilitate a fact-finder's attempts to sort out the truth, we have not held that such procedures are necessary in all cases. In fact, we have held that "FERC may resolve factual issues on a written record unless motive, intent, or credibility are at issue or there is a dispute over a past event." *Union Pac. Fuels,*

---

5. In light of our remand for reevaluation of heavy resid as a coker feedstock, the absence of the PIMS model from the record could in any event be no more than harmless error.

*Inc. v. FERC,* 129 F.3d 157, 164 (D.C.Cir. 1997); *see also Louisiana Ass'n of Indep. Producers & Royalty Owners v. FERC,* 958 F.2d 1101, 1113 (D.C.Cir.1992) (party may not complain that it was deprived of a fair hearing after receiving notice of expert testimony on which opposing party relied, an opportunity to review it, a chance to submit briefs criticizing it and evidence opposing it, and the opportunity to argue before the Commission). In this case, there is a dispute among experts over the proper method for valuing petroleum streams. This type of technical dispute is amenable to resolution by resort to the written record, particularly where Tesoro had significant opportunities to submit evidence of its own and criticize the evidence submitted by the Nine Parties. We decline to overturn FERC's decision.

## VII. PROSPECTIVE APPLICATION OF THE SETTLEMENT

### A. Exxon and Tesoro's Position

██ Exxon and Tesoro argue that FERC committed legal error when it decided that it would implement the settlement order prospectively only. The method that we found unreasonable and remanded has been in effect since 1993, and the Commission stated when it was adopting the distillation methodology that in the event it was reversed and Exxon suffered economic losses, it could correct any legal errors after the appeal. *See* Order on Rehearing, *Trans Alaska Pipeline Sys.,* 66 FERC ¶ 61,188, at 61,423 (1994). Now, when it has corrected the legal errors identified in *OXY,* the Commission has opted to apply the new rates prospectively only, leaving the parties without remedy for the years of unlawful valuations, and granting the settling parties a windfall.

Exxon argues that this circuit's precedents require FERC to return the parties to the position they would have occupied had this legal error not been made. *See Public Utils. Comm'n of the State of California v. FERC,* 988 F.2d 154, 168 (D.C.Cir.1993) (*"CPUC"*) (citing cases); *see also, e.g., Panhandle Eastern Pipe Line Co. v. FERC,* 907 F.2d 185, 189 (D.C.Cir.1990); *Office of Consumers' Counsel, State of Ohio v. FERC,* 826 F.2d 1136, 1139 (D.C.Cir.1987) (per curiam). This rule is drawn from "the logic of the statute itself." *Natural Gas Clearinghouse v. FERC,* 965 F.2d 1066, 1074 (D.C.Cir.1992).

FERC's reasons for refusing to do so, Exxon argues, are wrong as a matter of law. First, the agency agreed with the ALJ that the cases cited by Tesoro and Exxon are not dispositive because, while *CPUC* and *Panhandle* "recognized that the Commission has the authority in some circumstances to issue orders which have retroactive effect, neither of those cases required it." 1997 Opinion, 80 FERC ¶ 63,015, at 65,242. Exxon argues that the language from those cases explicitly states that "when the Commission commits legal error, the proper remedy is one that puts the parties in the position they would have been in had the error not been made." *CPUC,* 988 F.2d at 168. This use of the word *"the,"* as opposed to "a," proper remedy suggests FERC must order retroactive payment when it commits legal error.

Exxon also argues that FERC improperly attempts to rely on the filed rate doctrine as mandating prospective application of its order. *See* 1997 Order, 81 FERC ¶ 61,319, at 62,467. Exxon argues that despite its protestations, FERC has the authority to correct its error, and that the shippers had notice that there might be a later correction to the rate, which "'changes what would be purely retroactive ratemaking into a functionally prospective process by placing the relevant audience on notice at the outset that the rates being promulgated are provisional only and subject to later revision.'" *Natural Gas Clearinghouse,* 965 F.2d at 1075 (quoting *Columbia Gas Transmission Corp. v. FERC,* 895 F.2d 791, 797 (D.C.Cir. 1990)).

Exxon next argues that even if FERC did have discretion to determine whether to apply the corrected valuation retroactively, its failure to do so in this case amounts to an abuse of that discretion. FERC stated as reasons for its decision the observations that the change here was one of valuation, not of methodology, and that the Quality Bank was *sui generis*. Neither of these reasons, it contends, supports the decision not to remedy the injury to Exxon and Tesoro. Exxon notes that FERC had retroactively applied adjustments in vacuum gas oil rates that were set under the distillation method, rendering both justifications meaningless. Exxon also points out that FERC does not explain how the "*sui generis*" nature of the Quality Bank has any bearing on whether the aggrieved parties should be made whole.

Exxon further argues that the refusal to make the aggrieved parties whole violates the central purpose of the Quality Bank, which was created as part of FERC's " 'continuing obligation to ensure that pipeline rates are just and reasonable.' " *OXY*, 64 F.3d at 690 (citing 49 U.S.C. § 1(5) and quoting *Texas Eastern Transmission Corp.*, 893 F.2d at 774). Moreover, it contends, this abuse of discretion is compounded because FERC refused the injured parties a stay pending appeal in 1994 on the basis that it could correct any legal errors later found on appeal.

Exxon cites a string of our precedents holding that it is proper to correct such legal errors retroactive to the time they occurred. In *Tennessee Valley Municipal Gas Association v. FPC*, 470 F.2d 446 (D.C.Cir.1972), we held: "If the policy of the Natural Gas Act is not arbitrarily to be defeated by uncorrected Commission error, the [injured party] must be put in the same position that it would have occupied had the error not been made." *Id.* at 452. In *Public Service Co. of Colorado v.*

*FERC*, 91 F.3d 1478 (D.C.Cir.1996), we stated: "Absent detrimental and reasonable reliance, anything short of full retroactivity ... allows [some parties] to keep some unlawful overcharges without any justification at all. The court strongly resists the Commission's implication that the Congress intended to grant the agency the discretion to allow so capricious a thing." *Id.* at 1490. The *Public Service Co.* decision was made in the context of the Natural Gas Policy Act. We held that the parties were on notice of a potential change in the way a tax would be charged to customers, and thus did not detrimentally rely on the agency's prior position. As a result, we held that it was fair to make refunds of those tax charges retroactive to the date of notice.

Finally, Exxon argues that FERC's so-called equitable exercise of its discretion failed to give any weight to the injury to the parties and the resulting windfall to the Nine Parties, who benefit because of agency error, rendering the agency's ultimate decision irrational.

### B. FERC's Position

FERC argues that the Commission properly concluded that the equitable approach would be to implement the settlement on a prospective basis, as all other TAPS settlements had been. The cases cited by Exxon address the issue of whether FERC is barred from applying a remedy retroactively, not whether it is required to do so. FERC's discretion is at its zenith when deciding what kind of remedy to apply. *See Towns of Concord, Norwood, & Wellesley, Mass. v. FERC*, 955 F.2d 67, 76 (D.C.Cir.1992). FERC asserts that it made its decision based on several equitable factors[6]:

FERC took note (1) that parties supported the Nine Party Settlement only if it were implemented prospectively; (2) that all prior TAPS cases resolved by

---

6. Factor number one, we note, is mentioned only in the agency's brief to this court and not in its decision.

settlements have been on a prospective basis; (3) that the changes adopted by the Settlement Order only modify limited aspects of the distillation methodology put in place in 1993; and (4) that the TAPS Quality Bank is *sui generis*. 81 FERC at 62,467.

FERC Brief at 59. Therefore, FERC argues, it did not abuse its discretion. FERC also notes that it did not "bait and switch" Exxon in denying the stay because each remedy must be decided on its own merits.

### C. Intervenors' Position

Intervenors note that we have made clear that FERC has discretionary authority over whether a settlement should have retroactive effect. *See CPUC*, 988 F.2d at 168. *See also Cities of Batavia, Naperville, Rock Falls, Winnetka, Geneva, Rochelle and St. Charles, Ill. v. FERC*, 672 F.2d 64, 85 (D.C.Cir.1982) ("It is clear . . . that in denying a refund in this case the Commission also considered the practical consequences and the purpose of the Act; hence we are required to uphold its exercise of discretionary power"); *Second Taxing Dist. of the City of Norwalk v. FERC*, 683 F.2d 477, 490 (D.C.Cir.1982) ("Refunds are not mandatory; the Commission has discretion to decide whether a refund is warranted in light of the interests of the customer and the utility."). *OXY* did not require any result in this case, and in the absence of a clear mandate, they argue, FERC properly exercised its discretion.

### D. Analysis

We agree that FERC does have a measure of discretion in determining when and if a rate should apply retroactively. However, such discretion is not without its limits, and we hold that FERC abused that discretion.

The agency's passing mention of the filed rate doctrine has no bearing on FERC's discretion to reallocate Quality Bank credits to correct FERC's erroneous valuations of the distillate and resid cuts because all of the TAPS shippers were on notice as of 1993 that the valuations were contested. FERC mentioned the filed rate doctrine not as a justification for its exercise of discretion, but in discussing the prior decision, in which the filed rate doctrine was decisive. As we stated in *OXY*, "[t]he rule against retroactive ratemaking . . . 'does not extend to cases in which [customers] are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service.' The goals of equity and predictability are not undermined when the Commission warns all parties involved that a change in rates is only tentative and might be disallowed." 64 F.3d at 699 (quoting *Natural Gas Clearinghouse*, 965 F.2d at 1075). In fact, all of the parties participated in the proceedings before the agency. Any reliance that they may have placed on the rates in light of these proceedings was unwarranted. As we stated in *Public Service Co.*, "[a]bsent detrimental and reasonable reliance, anything short of full retroactivity . . . allows [some parties] to keep some unlawful overcharges without any justification at all." 91 F.3d at 1490.

 There is also a strong equitable presumption in favor of retroactivity that would make the parties whole. As we have stated, "when the Commission commits legal error, the proper remedy is one that puts the parties in the position they would have been in had the error not been made." *CPUC*, 988 F.2d at 168. This is not to say that FERC must do so in every case if the other considerations properly within its ambit counsel otherwise. However, FERC's listed equitable factors have no bearing on the decision and do not explain its decision not to make whole parties who are clearly injured by undervaluation. Given the strong presumption in favor of making injured parties whole and the incentive that this creates for the parties to litigate regarding past errors and for the agency to correct those errors,

on the record before us we hold that FERC abused its discretion when it failed without adequate explanation to make the revaluation and concomitant Quality Bank adjustments retroactive to 1993, when the distillation method was adopted.

We recognize FERC's concern that the Nine Parties have stated that they would not support the settlement if it applied retroactively. However, we cannot uphold on this basis a contested settlement in which the settling parties agree to divvy up a windfall at the expense of the contesting parties. The agency cannot simply take a head count among the parties in a contested settlement and decide that since those who will benefit from a settlement outnumber those who will suffer, it is fair to allow the majority to settle the issue in their favor. In settlements where the power of the agency is not being invoked to overcome the objections of some parties, all sides typically give up something to arrive at a mutually painful but acceptable position. It should be unsurprising that the Nine Parties are unwilling to support the settlement unless it remains in their favor if they can invoke the might of FERC to cram such a settlement down the minority's throats. Parties raising legitimate legal objections cannot be overlooked simply because they are outnumbered, even if the result is that it sends all parties back to the negotiating table or the hearing room. The issue of the effective date of the new valuation method is remanded for action consistent with this opinion.

## VIII. CONCLUSION

We uphold FERC's decision with two exceptions—we find that the decision to use FO–380 less 4.5 cents on the West Coast and Gulf Coast Waterborne 3% sulfur No. 6 fuel oil less 4.5 cents on the East Coast as proxies for the market valuation for resid was not supported by substantial evidence and that the decision to apply the settlement prospectively was an abuse of discretion. We vacate those portions of FERC's order and remand to the agency to reconsider these issues in light of our opinion. We deny the petitions for review in all other respects.