# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued November 8, 2010       Decided January 18, 2011

No. 09-1236

FLINT HILLS RESOURCES ALASKA, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

CONOCOPHILLIPS ALASKA, INC., ET AL.,
INTERVENORS

————

Consolidated with 09-1251

————

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

————

*James M. Armstrong* argued the cause for petitioner. With him on the briefs were *David D'Alessandro*, *Richard A. Curtin*, *Patricia F. Godley*, *Howard E. Shapiro*, and *Jonathan D. Simon*. *Dennis Lane* and *Marie D. Zosa* entered appearances.

*Kathrine L. Henry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondents. With her on

the brief were *John J. Powers III* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, *Thomas R. Sheets*, General Counsel, Federal Energy Regulatory Commission, and *Robert H. Solomon*, Solicitor.

*Matthew W.S. Estes* argued the cause for intervenors ConocoPhillips Alaska, Inc., et al. in support of respondents. With him on the brief were *John A. Donovan* and *John Wyeth Griggs*.

Before: TATEL, *Circuit Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the court filed by *Senior Circuit Judge* WILLIAMS.

Dissenting opinion filed by *Senior Circuit Judge* RANDOLPH.

WILLIAMS, *Senior Circuit Judge*: Section 4412 of the Motor Carrier Safety Reauthorization Act of 2005, Pub. L. No. 109-59, 119 Stat. 1144, 1778-79 (2005) ("§ 4412") imposes a limit on the retroactivity of Federal Energy Regulatory Commission orders changing "quality bank adjustments" paid to oil shippers on the Trans Alaska Pipeline System ("TAPS"). Specifically, it provides that for proceedings starting after the date of enactment such orders cannot reach back more than 15 months before "the earliest date of *the first order* of the Federal Energy Regulatory Commission *imposing quality bank adjustments* in the proceeding." § 4412(b)(2) (emphasis added). In a proceeding covered by § 4412(b)(2), the Commission identified its initial order, allowing a carrier-filed adjustment to take effect and setting the matter for hearing, as § 4412(b)(2)'s "first order." We find this interpretation inconsistent with the statute's

language and purpose, and vacate and remand the Commission's orders.

* * *

Multiple shippers use TAPS to transport crude oil extracted from oil fields in northern Alaska. The oil they tender to the pipeline varies in quality, but it flows through the pipeline in a commingled stream. In the absence of an accounting adjustment, shippers tendering low-quality oil would gain a windfall on their ultimate receipt of the same quantity of oil as they shipped, while those tendering higher-quality oil would be harmed.

The TAPS quality bank is an accounting arrangement designed to put the shippers in the same economic position that they would have enjoyed absent commingling. FERC, which regulates TAPS under the Interstate Commerce Act, 49 U.S.C. § 1 et seq. ("ICA"),[1] has been involved from the outset in establishing the methodology for valuing different types of oil (called "cuts"). For a general description of the process, see *Exxon Co., U.S.A. v. FERC*, 182 F.3d 30, 32-36 (D.C. Cir. 1999).

---

[1] In the Department of Energy Organization Act, Pub. L. No. 95-91, § 402(b), 91 Stat. 565, 584 (1977), codified as 49 U.S.C. § 60502 (2010), Congress transferred regulatory authority over oil pipelines from the Interstate Commerce Commission to FERC. FERC's regulation of oil pipelines is governed by the ICA as it existed on October 1, 1977. See Revised Interstate Commerce Act, Pub. L. No. 95-473, § 4(c), 92 Stat. 1337, 1470 (1978). All references to the ICA in this opinion are to that version of the ICA, which can be found in 49 U.S.C. §§ 1-15 (1976), or reprinted in 49 U.S.C. §§ 1-15 (1988).

4

We deal here with the valuation assigned the "heavy distillate" cut. This had been valued on the basis of Platts' West Coast spot price for diesel fuel of a specified sulfur content, less an adjustment for processing costs. Effective June 1, 2006, Platts dropped that quote in favor of a quote for a diesel with a much lower sulfur content. Acting under a provision of the tariff governing all the carrier firms owning the pipeline, the carriers and the Quality Bank Administrator (the latter being an office set up to manage the quality bank) filed on July 28, 2006 a "Notice of Radical Alteration in Basis for West Coast Heavy Distillate Price Quotation and Recommended Replacement Price" ("Notice"). The Notice proposed an alternative formula for valuation of heavy distillate, to take effect, absent action by FERC and the Regulatory Commission of Alaska, as of the 60th day after filing. It is undisputed that the notice and its effective-date provision were in accord with the tariff and with § 15(7) of the ICA, which governs carrier-filed rate changes.

The filing precipitated the usual Commission proceedings and the usual stream of orders. First, the Commission on September 26, 2006 issued its hearing order, which accepted the proposed adjustment subject to refund, and ordered a hearing on a disputed element (the processing cost adjustment). *BP Pipelines (Alaska), Inc.*, 116 FERC ¶ 61,291 (2006) (the "Hearing Order"). The administrative law judge held a hearing and on September 7, 2007 issued an initial decision, rejecting the filing's provision on processing costs and substituting another. *BP Pipelines (Alaska), Inc.*, 120 FERC ¶ 63,018 (2007). The Commission on March 20, 2008 affirmed that decision. *BP Pipelines (Alaska), Inc.*, 122 FERC ¶ 61,236 ("Opinion No. 500"). Besides doing so, Opinion No. 500 directed the TAPS carriers to make a "compliance filing," establishing the processing cost component of the heavy distillate valuation as prescribed by the Commission. The carriers made such a filing on April 2,

2008, and the Commission on December 2, 2008 accepted it and made it retroactive to June 1, 2006 (date of the cessation of the old Platts' quotation). *BP Pipelines (Alaska), Inc.*, 125 FERC ¶ 61,254 (2008) (the "Compliance Order"). Petitioners sought rehearing with respect to the effective date, which was denied August 19, 2009. 128 FERC ¶ 61,169 (2009) ("Rehearing Order").

To recapitulate key events in the sequence:

September 26, 2006: Hearing Order.
March 20, 2008: Opinion No. 500.
December 2, 2008: Compliance Order.

The parties have radically different ideas as to which of these orders qualifies as "the first order . . . imposing quality bank adjustments." In the Compliance Order, the Commission chose its Hearing Order. Petitioners prefer the Compliance Order itself. One of the petitioners before us previously championed Opinion No. 500, but has since dropped that position.

\* \* \*

Because FERC is entrusted with the administration of § 4412, we review its interpretation under the principles of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). These of course require us, if the statute is ambiguous, to defer to any reasonable Commission interpretation. Although we find the language of § 4412 ambiguous in the sense of permitting more than one interpretation, the Commission's is not among them.

The statute limits retroactive orders as follows:

(1) IN GENERAL. – In a proceeding commenced before the date of enactment of this Act, the Federal Energy Regulatory Commission may not order retroactive changes in TAPS quality bank adjustments for any period before February 1, 2000.

(2) PROCEEDINGS COMMENCED AFTER THE DATE OF ENACTMENT. – In a proceeding commenced after the date of enactment of this Act, the Commission may not order retroactive changes in TAPS quality bank adjustments for any period that exceeds the 15-month period immediately preceding the earliest date of the first order of the Federal Energy Regulatory Commission imposing quality bank adjustments in the proceeding.

§ 4412(b).

Congress adopted § 4412 in response to a particular Commission decision issued in a prolonged quality bank proceeding. In that proceeding a FERC order required quality bank adjustment refunds, authorized by § 15(7) of the ICA, going back to December 1, 1993, eleven years before the order's date. *Trans Alaska Pipeline System*, 108 FERC ¶ 63,030, P 2952 (2004). See also *Exxon Co., U.S.A.*, 182 F.3d at 49 (issuing the rulings that in the end required such refunds). Because Alaskan refiners would be among those required to pay refunds (with interest) going back more than ten years, Alaska's representative and senators introduced bills in Congress that would abolish FERC's authority to order any retroactive quality bank adjustments. S. 822, 109th Cong. (2005); H.R. 2038, 109th Cong. (2005); see 151 Cong. Rec. S3751-53 (daily ed. Apr. 15, 2005) (statements of Sen. Murkowski and Sen. Stevens); 151 Cong. Rec. E825-26 (daily ed. Apr. 28, 2005) (statement of Rep. Young). But the bills were not enacted as proposed. Instead Congress imposed the limit on "retroactive changes" quoted above.

The parties have argued the case largely as if the Hearing Order played only the conventional role of such an order under § 15(7), namely, allowing the rate filed by the carriers to go into effect as filed (potentially subject to suspension for a maximum of seven months). There was in fact a curious wrinkle, but we first deal with the matter as the parties have.

Under the tariff, the carrier-proposed adjustment would take effect of its own accord within 60 days. In a conventional Commission exercise of its authority under § 15(7) and under this tariff, the Commission's hearing order would (apart from the possible suspension) simply allow the carriers' new rate to take effect in accordance with the carriers' filing. See ICA § 15(7) (providing that the Commission cannot suspend the rate more than seven months "beyond the time when it would otherwise go into effect"). A Commission decree under which nature simply takes its course—nature in this case being the new adjustment— cannot, in the conventions of ordinary discourse, be described as "imposing" the adjustment.

The unaddressed wrinkle here is that the Commission made the newly filed rate effective as of a date *earlier* than the one specified by the carriers and Quality Bank Administrator, namely June 1, 2006 (the date as of which the old Platts' quotation ceased to be effective in accordance with the tariff). Hearing Order, 116 FERC ¶ 61,291 P 6 n.3; Notice, at 3-4. The Hearing Order does not explain what authorized the Commission to choose such a date. Section 15(7) does not provide any obvious support for it. And finally, the passage of the tariff provided to us by the parties specifies that the controlling adjustment in such an interim period between the lapse of a relied-on price quotation and the carriers' proposed effective date should be "the unit value for

the last month for which a product price was available." *Id*. at 2.

Accordingly, if we were to characterize the Commission's footnote filling the gap between cessation of the old and initiative of the new as "imposing" an adjustment, it seems most unlikely to have been an adjustment, or an imposition of an adjustment, of the sort that the drafters of § 4412(b)(2) might have contemplated.

If ordinary language is somewhat against the Commission's theory, far more so is the usual conception that Congress expects its legislation to accomplish something— here, of course, to limit refunds' retroactive reach in cases that have dragged on interminably. In a standard proceeding under § 15(7), an order setting a newly filed rate for hearing is the *first* step in a process of reviewing the rate. And under § 15(7) the Commission's refund authority is inherently limited to reaching back to the original effective date of the newly filed rate, for it allows refunds only of "such portions of the increased rates or charges as by [the Commission's] decision shall be found not justified." Under the Commission's view, then, § 4412 would limit refunds (at least for proceedings under § 15(7)) only in a case where the Commission had delayed issuing any hearing order until 15 months after the filing's effective date.

But any such delay appears to be legally barred (at least in the cases where it is most likely a hearing order would be issued). 18 C.F.R. § 343.3(c) requires the Commission, whenever a § 15(7) filing is protested, to issue a hearing order "before the effective date of the tariff publication or within 30 days of the tariff filing, whichever is later." Even if there were no legal limit, FERC counsel conceded during oral argument that the Commission ordinarily issues a hearing order during the 60-day window contemplated by the tariff,

and could not recall a single case where it had waited 15 months. Oral Arg. Recording 22:20-24:10.

In an effort to suggest some scope for § 4412(b)(2) under its interpretation, FERC argues that § 4412 as a whole is concerned solely with resolution of quality bank adjustments prolonged by its having issued "unlawful orders." Compliance Order, 125 FERC ¶ 61,254 P 20; Rehearing Order, 128 FERC ¶ 61,169 P 45. This theory evidently rests on the fact that the very proceedings that triggered enactment of § 4412 featured FERC orders that we vacated and remanded, thereby undoubtedly delaying ultimate resolution of the case. See *Tesoro Alaska Petroleum Company v. FERC*, 234 F.3d 1286 (D.C. Cir. 2000); *Exxon Co., U.S.A.*, 182 F.3d 30; *Oxy USA, Inc. v. FERC*, 64 F.3d 679 (D.C. Cir. 1995).

The Commission's only suggestion of how this "unlawful order" notion would work is a hypothetical it offers, using this case as an example:

> On the other hand, if Opinion No. 500 were to be reversed on appeal, the Commission would establish a new proceeding to determine the processing cost adjustment, and the date of the first order in the new remand proceeding would be the date to which the section 4412(b)(2) 15-month limit would apply.

Rehearing Order, 128 FERC ¶ 61,169 P 45.

The Commission's idea that it would respond to reversal of an order such as Opinion No. 500 by starting a "new proceeding" leaves a mystery as to the status of the "old proceeding." Evidently it would just drop out of the picture, and the carriers' filed adjustment would prevail for that period. But this scenario contradicts the Commission's effort to ground its analysis in the prolonged struggle illustrated by

the *Exxon* case. If Congress regarded the Commission's activities after our reversals as starting "new proceedings," one would expect the drafters to have focused rather intently on defining or modifying "proceeding." No such thing. Rather, they used it without definition or other limitation, suggesting an assumption that it would cover the full sequence of rulings in which the Commission resolved a specific adjustment dispute. Similarly, the Commission tells us nothing about how it believes the line is to be drawn between a "new . . . proceeding" and a simple continuation of an ongoing one. What appears to be the Commission's first ruling after our *Exxon* decision, in the case that stirred the Alaska congressional delegation into action, *Trans Alaska Pipeline System*, 90 FERC ¶ 61,123 (2000), certainly says nothing to fill this gap in the Commission's theory. Finally, there is not one syllable in § 4412 suggesting that Congress had one iota more concern about delays engendered by court reversal than about ones deriving entirely from FERC itself.

Our observation here is not the standard claim that if Congress preferred a particular outcome it could have expressed the idea more clearly (a proposition that is always true in any seriously disputed case, and therefore always useless). Our point is that the Commission's belief that Congress was concerned *solely* with delays engendered by trips to the courts is belied by the complete absence of language even hinting at, much less trying to handle, the special circumstances associated with such a trip.

Intervenors offer another scenario in which, they say, § 4412(b)(2) could actually have an effect, even as interpreted by FERC. If a shipper challenges an existing filed rate under § 13(1), and the Commission has not previously found that rate to be just and reasonable, the shipper may recover reparations for up to two years prior to filing its complaint. See ICA § 16(3) (requiring complaint within two years of

action's accrual).  See also *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway Co.*, 284 U.S. 370, 390 (1932) (holding that the Commission may not order reparations where a carrier complied with the Commission's earlier order declaring its rate to be reasonable); *BP W. Coast Products, LLC v. FERC*, 374 F.3d 1263, 1304 (D.C. Cir. 2004). Because no parties have indicated to us whether there is, or has recently been, a substantial realm of "cuts" not covered by FERC-approved formulae (only unapproved ones would be eligible for retroactive reparations in § 13(1) complaint proceedings), we have no reason to suppose that there is in fact any room for FERC to impose retroactive adjustments under §§ 13(1), 16(3).  In any event, given Congress's clear focus on a notorious proceeding under § 15(7), an interpretation of § 4412(b)(2) that is useless in that realm can hardly be justified by the possibility that it might function usefully in the hypothetical arena of complaints under § 13(1).

The Commission argued in its Rehearing Order that if the Hearing Order does not qualify as § 4412(b)(2)'s "first order . . . imposing . . . adjustments," the upshot would be that an adjustment determined to have been unjust and unreasonable would go partially unremedied.  Rehearing Order, 128 FERC ¶ 61,169 P 43.  But *any* fixed time limit on correction of a rate later found unjust and unreasonable obviously entails such a partial lack of remedy.  Such a limited remedy similarly inheres, for example, in ICA § 15(1)'s provision that, on a finding that an existing rate is unjust and unreasonable, the Commission "is authorized . . . to determine" the just and reasonable rate "to be *thereafter* observed."  Congress often makes a trade-off between a goal of fully correcting unjust or unreasonable rates and an aversion to unduly unraveling past transactions.  The Commission's job, subject to our review, is to give effect to Congress's resolution of that trade-off.

In an argument that seems wholly irrelevant, the Commission notes that the Hearing Order gave all parties notice of the prospect of a refund of the same scope as would have applied under the law in the absence of § 4412. We cannot see how that helps interpret § 4412. Congress's purpose was to *alter* the prior arrangements and limit retroactive effect vis-à-vis what would previously have prevailed.

In sum, the Commission's interpretation of § 4412's phrase, "the first order . . . imposing quality bank adjustments," does not readily match ordinary usage of the terms Congress employed, and, if it fulfills Congress's goal at all, does so only with respect to a specialized set of delays that no word of § 4412 singles out for special treatment, or for a realm (that of § 13(1)) that may be irrelevant and was obviously not central to the congressional concern.

There are two issues that we do not resolve. First, although invalidating the Commission's selection of the Hearing Order's date as "the first order . . . imposing . . . adjustments in the proceeding," we do not choose among the alternate candidates for that role. Second, we do not address petitioners' contention that § 4412(b)(2), in barring "retroactive changes . . . *for any period that exceeds the 15-month period* immediately preceding the earliest date of the first order," § 4412(b)(2) (emphasis added), limits refunds to a maximum total period of 15 months. Resolution of that issue should occur in an analysis integrating it with a lawful choice of "the first order."

We grant the petition for review, vacate FERC's orders with respect to the effective date of the refund, and remand to FERC for proceedings consistent with this opinion.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, dissenting: I would deny the petition.

The Commission's interpretation fits comfortably within the language of § 4412(b)(2). Before the hearing order of September 26, 2006, the carriers (through the Quality Bank Administrator) were legally required to apply, and the quality bank participants obligated to pay, one adjustment for the heavy distillate cut. After that order, they were legally required to apply another. It follows that the September 26 order "impos[ed]" an adjustment within the meaning of § 4412(b)(2), or at the least, the Commission reasonably thought it did so.

The majority opinion rejects the Commission's interpretation on the basis that it violates "conventions of ordinary discourse." Maj. Op. at 7. Agency orders dealing with quality bank adjustments on the Alaskan pipeline do not strike me as the subject of "ordinary discourse." The majority explains that the Commission was not "imposing" anything because it had no discretion to adopt a rate other than the one the carriers proposed. I do not see why this discretionary element is an essential ingredient of "imposing" an adjustment within the meaning of § 4412(b)(2). Our court has spoken of a district court "imposing" a mandatory sentence—that is, one that it was legally required to give. *See, e.g.*, *United States v. Gaviria*, 116 F.3d 1498, 1512 (D.C. Cir. 1997). The hearing order gave the carriers' proposed rate legal sanction. This is all that § 4412(b)(2) can be read to require.

Nor do I see why the fact that the carriers' proposed rate would, under the tariff, automatically take effect if the Commission took no action should affect this conclusion. As I read the tariff, after a filing of a notice of radical alteration, the Commission may *either* issue an order imposing the carrier-proposed rate (possibly subject to hearing) *or* the carrier-

proposed rate will take effect after sixty days. The existence of the second option does not make the first less of an imposition.

The majority also believes—incorrectly in my view—that the Commission's interpretation rendered § 4412(b)(2) meaningless. In the Commission's view, Congress enacted § 4412(b)(2) "to prevent a recurrence of the prospect of a lengthy refund period caused by extensive litigation over an unlawful order." 125 FERC ¶ 61,254 P 20. The legislative history cited in the majority opinion, Maj. Op. at 6, indicates that Congress was particularly concerned with the extended periods of retroactivity made possible by litigation in the court of appeals and intended to limit the incentives to litigate Commission orders created by the possibility of such retroactivity. *See, e.g.*, 151 Cong. Rec. S3752 (daily ed. Apr. 15, 2005) (statement of Sen. Murkowski). The Commission's interpretation may not be plain from the text of § 4412(b), but all indications are that Congress wanted somehow to limit retroactive changes in quality bank proceedings. The Commission's interpretation achieves this purpose, and it does so in a rational manner. That is enough.

The majority has this response to the Commission's "unlawful order" interpretation: if Congress was concerned with this scenario, it would have addressed it more specifically in § 4412. This sort of argument, which is often deployed, has very little force for reasons we have explained. "Congress almost always could write a provision in a way more clearly favoring one side—or the other—in a dispute over the interpretation of a statute. Its failure to speak with clarity signifies only that there is room for disagreement about the statute's meaning." *Doris Day Animal League v. Veneman*, 315 F.3d 297, 299 (D.C. Cir. 2003). Under *Chevron* the fact that Congress has left certain terms unspecified should count *for* the agency, not against it. The Commission's interpretation is a

reasonable reading of the text, even if we would not adopt it under a *de novo* standard. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984).

I therefore respectfully dissent.