**TESORO ALASKA PETROLEUM COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION and United States of America, Respondents.**

**Williams Alaska Petroleum Inc., et al., Intervenors.**

Nos. 99–1223, 99–1224, 99–1239 and 99–1250.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 2000.

Decided Dec. 19, 2000.

Virginia A. Seitz and Robert H. Benna argued the causes for petitioners Exxon Company, U.S.A. and Tesoro Alaska Petroleum Company. With them on the briefs were Eugene R. Elrod, Steven S. Hill and Jeffrey G. DiSciullo.

Andrew K. Soto, Attorney, Federal Energy Regulatory Commission, argued the cause for respondents. With him on the brief were John H. Conway, Acting Solicitor at the time the brief was filed, Timm L. Abendroth, Attorney, Joel I. Klein, Assistant Attorney General, John J. Powers, III

and Robert J. Wiggers, Attorneys. Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel, Federal Energy Regulatory Commission, entered appearances.

John A. Donovan argued the cause for intervenors BP Exploration (Alaska), Inc. et al. With him on the brief were Matthew W.S. Estes, Bradford G. Keithley, Charles William Burton, Jason F. Leif, Richard Curtin, Randolph L. Jones, Jr. John W. Griggs and W. Stephen Smith. Dean H. Lefler entered an appearance.

Albert S. Tabor, Jr., John E. Kennedy and S. Scott Gaille were on the brief for intervenors TAPS Carriers. Alex A. Goldberg entered an appearance.

Before: WILLIAMS, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Trans Alaska Pipeline System ("TAPS") is a 48–inch diameter pipeline carrying crude oil from Alaska's North Slope approximately 800 miles south to Valdez, Alaska. Each shipper delivers its own crude oil to the pipeline, in which the oils are commingled; at the terminus the shipper takes delivery of a proportional share of the common stream. The crude oils delivered initially differ from each other in various characteristics that affect market value. Because of the commingling, a shipper will not in all likelihood receive the same quality of oil at Valdez that it delivered to the pipeline. Without some adjustment, the ones delivering relatively higher-value crudes would unfairly lose, and the ones delivering lower-value crudes would unfairly gain. The parties here battle over the formula governing the adjustment, which the Federal Energy Regulatory Commission controls in the exercise of its authority to regulate interstate oil pipeline rates.[1]

---

1. The authority was originally vested in the Interstate Commerce Commission, then trans-

Exxon Company, U.S.A.[2] and Tesoro Alaska Petroleum Company filed complaints with the Federal Energy Regulatory Commission assailing aspects of the prevailing formula. Exxon challenges the formula itself, a so-called "distillation" methodology that the Commission adopted in 1993 and later modified in 1997; Tesoro contests the specific valuation of two "cuts" of petroleum, West Coast naphtha and West Coast vacuum gas oil ("VGO"). A rate order must be modified where "new evidence warrants the change." *Tagg Bros. & Moorhead v. United States*, 280 U.S. 420, 445, 50 S.Ct. 220, 74 L.Ed. 524 (1930). Both Exxon and Tesoro appear to have offered evidence that is new in relation to what was before the Commission in its earlier determinations and sufficiently compelling to require reconsideration of the earlier resolution. We therefore reverse and remand the case for the Commission to reconsider the adoption of the distillation methodology and the pricing of West Coast naphtha and West Coast VGO, or to provide a suitable explanation for why it should not.

\* \* \*

In 1984 the Commission approved a settlement agreement establishing a "Quality Bank" to make the required adjustments between shippers. See *Trans Alaska Pipeline System*, 29 FERC ¶ 61,123 (1984).[3] The Quality Bank initially used a so-called "gravity" method. As the term gravity is used here, it is a measure of density established by the American Petroleum Institute ("API"). In contrast to "specific gravity", a higher API gravity represents a *less* dense crude oil or petroleum product. See *Exxon Co., U.S.A. v. FERC*, 182 F.3d 30, 35 n.1 (D.C.Cir.1999). Because crude oil was generally more valuable to the extent that it was "higher"-gravity, i.e., lighter, the Quality Bank initially valued crude oils according to their gravity.

Starting in 1987, the amount of natural gas liquids ("NGLs") in the stream increased, changing the picture—or at least the perception. Two factors contributed to this increase. First, natural gas operations expanded in Prudhoe Bay, resulting in sharply increased deliveries of NGLs at the head of the pipeline. *OXY USA, Inc. v. FERC*, 64 F.3d 679, 691 (D.C.Cir.1995); see also *Exxon Co., U.S.A. v. Amerada Hess Pipeline Corp.*, 87 FERC ¶ 61,133 at 61,521 (1999) (*"Exxon Decision"*). Second, expansion of one refinery and construction of another along the route led to an increase in removal of valuable mid-weight petroleum products from the stream, apparently leaving a higher proportion of the lighter NGLs in the petroleum at the end of the pipeline. *OXY*, 64 F.3d at 691; see also 57 FERC ¶ 63,010, at 65,053 (1991). NGLs have a much higher API gravity relative to other petroleum components, but critics of the gravity method argue that NGLs reduce rather than raise the value of the common stream. See *OXY*, 64 F.3d at 686.

Responding to the resulting complaints under § 13(2) of the Interstate Commerce Act, the Commission in 1989 started to

---

ferred to the Federal Energy Regulatory Commission when it replaced the Federal Power Commission in 1977. See 49 U.S.C.App. §§ 1 *et seq.* (1988); see also 49 U.S.C. § 60502 ("The Federal Energy Regulatory Commission has the duties and powers related to the establishment of a rate or charge for the transportation of oil by pipeline or the valuation of that pipeline *that were vested on October 1, 1977,* in the Interstate Commerce Commission or an officer or component of the Interstate Commerce Commission.") (emphasis added). The Commission's jurisdiction over the rates for oil going through to Valdez is

uncontested. See *Trans Alaska Pipeline System*, 23 FERC ¶ 61,352 at 61,762 (1983).

**2.** Exxon Company, U.S.A. was a division of Exxon Corporation. Since filing its appeal, Exxon Corporation has merged with Mobil Corporation to become Exxon Mobil Corporation.

**3.** Unless stated otherwise, all citations to FERC orders have the title "Trans Alaska Pipeline System".

investigate the gravity method. It found that the method was no longer just and reasonable and, in approving a contested settlement in 1993, adopted the distillation method. See 65 FERC ¶ 61,277 (1993) ("*Distillation Decision*"), order on reh'g, 66 FERC ¶ 61,188 (1994), further order on reh'g, 67 FERC ¶ 61,175 (1994). This latest method recognizes eight "cuts" of petroleum products (propane, isobutane, normal butane, natural gasoline, naphtha, distillate, VGO and resid) in each stream entering TAPS, ranked by their boiling points. The cuts are individually priced. Each shipper's delivery is categorized under this system and valued in accordance with the volume-weighted price of its component cuts. Because Alaskan North Slope ("ANS") oil is sold in both the Gulf Coast and West Coast markets, each cut is assigned Gulf Coast and West Coast prices. *Distillation Decision*, 65 FERC at 62,290.

For some cuts there were acceptable indicators of market value from the Oil Price Information Service ("OPIS") or Platt's Oilgram. No such markers were available, however, for distillate, VGO or resid, or for West Coast naphtha. For these cuts the settlement proposed to use prices for kindred products, adjusted for differences between them and the actual cuts. The Commission rejected this approach, saying that for a system to be non-discriminatory it must use "market prices, uncomplicated by subjective adjustments." *Id.* at 62,289. As part of this "No Adjustment Policy," the Commission rejected the proposed use of adjusted West Coast prices to value the West Coast naphtha cut and instead set a Gulf Coast price for the cut. On rehearing, it also ordered the use of Gulf Coast prices for West Coast deliveries of VGO. *Tesoro Alaska Petroleum Co. v. Amerada Hess Pipeline Corp.*, 87 FERC ¶ 61,132 at 61,514 (1999) ("*Tesoro Decision*"). In *OXY* we affirmed the switch from the gravity to the distillation method but remanded to the Commission its refusal to adjust the reference prices for the distillate and resid cuts. 64 F.3d at

701. In due course the Commission approved a nine-party settlement on these issues, providing for some redefinition of cuts and for use (for several of the cuts) of petroleum product prices adjusted to reflect processing costs. See 81 FERC ¶ 61,319, at 62,462–65 (1997). On review, we rejected the revised valuation of the resid cut and again remanded. *Exxon*, 182 F.3d at 42.

In 1996, while the *OXY* remand was under way, Exxon filed a complaint against seven TAPS owners pursuant to §§ 9, 13(1) and 15(1) of the Interstate Commerce Act, 49 U.S.C.App. §§ 9, 13(1), 15(1) (1988)—leading to the present case. Upholding an ALJ decision, the Commission dismissed the complaint, holding that Exxon had failed to produce evidence of changed circumstances to justify re-examination of the 1993 adoption of the distillation method. *Exxon Decision*, 87 FERC at 61,527–30.

Tesoro participated in the proceedings before the ALJ on Exxon's complaint, raising issues that the ALJ ultimately identified as different from Exxon's. The ALJ's order of dismissal mooted Tesoro's arguments but noted that Tesoro was free to file its own complaint. *Exxon Co., U.S.A. v. Amerada Hess Pipeline Corp.*, 83 FERC ¶ 63,011, at 65,102 & n.90 (1998). It did so in August 1998, attacking the valuation of the naphtha and VGO cuts. The Commission dismissed this, also on a finding of no changed circumstances. *Tesoro Decision*, 87 FERC at 61,517–20.

■ Petitioners argue that because their complaints were disposed of by Motion for Summary Disposition, our review is de novo. That would be true if we were reviewing a district court's equivalent action. But these dismissals implicate the Commission's expertise and policy-making authority, compelling deference. *Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The requisite defer-

ence does not, however, mean passive acceptance of irrational or unexplained decision making. *Id.*; see also *Louisiana Public Service Comm'n v. FERC*, 184 F.3d 892, 895 (D.C.Cir.1999). Here we find the Commission's answers to the evidence unconvincing.

\* \* \*

■ In *Tagg Bros. & Moorhead v. United States*, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524 (1930), the Supreme Court held that a "rate order is not *res judicata.*" *Id.* at 445, 50 S.Ct. 220. Specifically, where a party presents "new evidence [that] warrants the change," the regulatory agency has the power and duty "to institute new proceedings." *Id.* Just as a plaintiff may allege a new cause of action for every time a conspiracy in restraint of trade operates against him, see *Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72, 78 (D.C.Cir.1997), so each new shipment by a carrier gives rise to a new cause of action, as to which a previous adverse determination is not res judicata, *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir.1997); *Hawaiian Telephone Co. v. Public Utilities Comm'n of Hawaii*, 827 F.2d 1264, 1274 (9th Cir.1987). Issue preclusion might nonetheless be applicable, but *Tagg Bros.* suggests that any such application is quite weak.

The Commission acknowledges the authority of *Tagg Bros.*, but reframes Justice Brandeis's formula—allowing re-opening for "new evidence"—into one requiring evidence of "changed circumstances." It is unclear if any such limit may be imposed. In *OXY* itself we observed, "[t]he fact that a rate was once found reasonable does not preclude a finding of unreasonableness in a subsequent proceeding." 64 F.3d at 690 (internal quotation omitted). See also *Texas Eastern Transmission Corp. v. FERC*, 893 F.2d 767, 774 (5th Cir.1990). In *OXY*, as we noted, there were changed circumstances—the increased proportion of NGLs in the common stream, and in *Texas Eastern* there was an issue that the

prior determination had not confronted (the consistency of minimum commodity bills with cost allocation based on the modified fixed variable approach), 893 F.2d at 774. In rate cases that look toward the setting of a future rate (as this does, having been brought under § 13(1) of the Interstate Commerce Act), unacceptable competitive distortions could occur if one shipper were perpetually locked into a rate less advantageous than the one enjoyed by a competitor. The Supreme Court has emphasized this concern in the tax context:

[A] subsequent modification of the significant facts or a change or development in the controlling legal principles may make that [judicial] determination obsolete or erroneous, at least for future purposes. If such a determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers of the same class.

*Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 599, 68 S.Ct. 715, 92 L.Ed. 898 (1948). Accordingly, we have upheld the denial of issue preclusion where the Commission had initially rejected a requested rate on grounds of difficulties in tracing costs of service, but in a later proceeding the utility offered a solution. *Second Taxing Dist. of Norwalk v. FERC*, 683 F.2d 477, 484 (D.C.Cir.1982). The new solution was perhaps a changed circumstance, but it was one under the control of the utility and thus seems somewhat akin to new evidence. In any event, because the outcome of our decision here does not turn on the distinction between evidence of changed circumstances and evidence that is merely new, we need not decide whether there is any reason to retreat from the language of Justice Brandeis.

■ Exxon provided the testimony of Dr. Pavlovic, an economic consultant, who tested the accuracy of the modified distillation methodology for 34 crude oils in the California crude oil market from 1993 to 1996. Pavlovic used regression analysis to

compare the relative values of the cuts produced by the distillation method with actual market prices. He claimed his tests showed that the distillation method "substantially over-values low-value, heavier petroleum and substantially undervalues high-value, lighter petroleum." Joint Appendix ("J.A.") at 430. He also testified that this bias "increase[d] dramatically in 1994 and remain[ed] large thereafter." Id. at 451. A perfect pricing method would produce a coefficient of 1.0 in a regression of the method's relative values on those of the benchmark market. Whereas the coefficient—also called a bias measure—was indeed just over 1.0 for 1993 (1.07), it jumped in 1994 to 1.65 and remained around 1.6 for the next two years. Id. at 495. Pavlovic argued that he could reject, at a statistically significant level, the hypothesis that the bias measure was 1.0 in 1994–1996.[4] Id. at 453.

Pavlovic's testimony appears to constitute not only new evidence but changed circumstances as well. It shows that, for reasons not yet conclusively determined, the degree of bias resulting from the use of the distillation method rose from imperceptible to severe after 1993. The Commission's answer—that it "consistently has refused to base its decisions on how the TAPS Quality Bank should operate based on regression analyses of West Coast or world crude values," Exxon Decision, 87 FERC at 61,528—baffles us. The Commission cannot be saying that regression analysis, good enough to be a valuable tool for everyone else interested in quantitative analysis, is never good enough for the Commission.

The Intervenors offer an explanation that may be part of what the Commission in fact had in mind: "Dr. Pavlovic's analysis was like testing a methodology designed to value Alaskan apples by applying that methodology to a crate of California oranges." Intervenors' (BP Exploration (Alaska), Inc. et al.) Br. at 13 ("Intervenors' Br."). This glib use of the old apples-oranges metaphor overlooks the problem confronting the Commission:. There simply are no market prices for the Alaskan crude oils delivered into TAPS. If there were, there would be little or no issue about inferring their relative values. To the extent that the California crudes are similar to the Alaskan crudes, Pavlovic's technique seems to test the accuracy of the distillation method. Compare J.A. at 440–43.

Exxon also provided the testimony of Mr. Moore, an engineer, and Dr. Hausman, an applied economist. Moore stressed that the gravity of ANS crude oil (consisting of the streams that enter at the start of the pipeline at Pumping Station #1 and the return stream from refineries along its path) had increased from about 28° API in 1992 to about 30° API in 1996. Id. at 323. In the face of the theory that gravity increases due to NGL blending had undermined the gravity formula, Moore tracks the seemingly close positive relationship between the fraction of NGLs and gravity of this crude oil, and, critically, between the gravity and price of ANS crude (measured against West Texas Intermediate, a "marker crude" used as a reference for valuing other crudes). Id. at 323, 419, 421.

Exxon invokes the testimony of Moore not only to suggest that the premise of the 1993 abandonment of gravity was mistaken, but also to explain why one should expect occurrence of the sort of distortions that Pavlovic seemingly showed in the distillation method. Although there is an obvious link between crude oil values and petroleum product prices, they do not move in lockstep. The same event may drive the prices of the two in different directions. If a refinery shuts down because of equipment problems, for instance, it is likely to raise the market price of the

4. The parties appear to agree that here the reference point is November 30, 1993, the day on which the Commission ruled that the distillation method was just and reasonable. See Exxon Decision, 87 FERC at 61,526.

refined petroleum product, but may reduce demand for crude oil and lower its price. See *id.* at 342.

Hausman testified that regression results on price and gravity data from 1988 to 1997 showed that gravity was a significantly positive predictor of the price of ANS crude. *Id.* at 511–13. This evidence seems to show a positive correlation between (1) NGL blending, (2) gravity, and (3) value. Petitioners rely on the Moore and Hausman testimony to suggest that the distillation method seriously undervalues the NGL contribution to the TAPS stream. Aspects of Hausman's testimony might pose questions about the line between evidence that is "new" and evidence of changed circumstances. After all, Hausman claims that his regression results apply to the entire period of his data—from 1988 to 1997—indicating that the pre–1993 data also show the positive effect of gravity on ANS value. Overall, however, it certainly confirms the implication of the Pavlovic and Moore testimony that the distillation method is seriously flawed.

To dismiss the testimony of Moore and Hausman, the Commission's decision invoked our deference in *OXY* to the ALJ's conclusion that "the current straightline gravity basis for valuing crude oil does not assign an accurate value for NGLs," and our statement, "It follows from this conclusion that shippers delivering oil with a high NGL content were either being overcompensated or undercompensated under the gravity methodology...." 64 F.3d at 691 (cited by the Commission, *Exxon Decision,* 87 FERC at 61,528). But these remarks were plainly not intended to suggest indifference to the impact of NGL contributions to the value of the common stream. Quite the reverse: We were endorsing the ALJ's point that "the issue was not whether the gravity methodology accurately valued NGLs *per se,* but wheth-

er it placed a proper value on petroleum whose gravity had been increased as a result of the injection of substantial quantities of NGLs." 64 F.3d at 691. That issue is precisely what Exxon's testimony speaks to, seemingly calling into question the Commission's 1993 determinations.

\* \* \*

Tesoro challenges the current pricing of the naphtha and VGO cuts based on Gulf Coast market prices under the modified distillation method. Tesoro wants the Quality Bank to value West Coast naphtha using a formula based on West Coast gasoline prices and West Coast VGO using OPIS's quoted price for West Coast high sulfur VGO.

■ Tesoro argues that the Commission's use of the published Gulf Coast price, rather than a formula based on West Coast gasoline prices, significantly undervalues West Coast naphtha.[5] Its claim is based on three propositions. First, Tesoro presents evidence, and the Intervenors acknowledge, that Gulf Coast deliveries of ANS crude "have declined considerably from the somewhat less than 20% level that existed in 1993." Intervenors' Br. at 25; see also *Distillation Decision,* 65 FERC at 62,290. The nearly complete disappearance of Gulf Coast ANS sales suggests that the Commission's current reliance is more dubious now than in 1993.

Second, the Commission has changed its outlook on the use of "adjusted" market prices. In *OXY* we held that the Commission's "No Adjustment Policy," which used market prices instead of formulas, lacked an adequate foundation with respect to the distillate and resid cuts. 64 F.3d at 694 (holding that the Commission "cannot, consistent with the requirement of reasoned decisionmaking, value some cuts precisely and others haphazardly"). On remand, the Commission seems to have abandoned

---

**5.** Naphtha is used to make gasoline. Because there are considerable trades on the Gulf Coast, there is a quoted price for Gulf Coast

naphtha. On the West Coast, however, refineries overwhelmingly use their own naphtha rather than buying it. See J.A. at 940–41.

its No Adjustment Policy, adopting adjusted prices for several cuts. See 81 FERC at 62,460–65. The Commission tries to distinguish its treatment of distillate and resid by suggesting that its No Adjustment Policy could be trumped only when there is no reliable published price for a cut in *either* market. See Respondents' Br. at 56. But our decision in *OXY* does not rely on this distinction. See 64 F.3d at 693. In fact, we made clear in *OXY* that our concern was that the Commission use *uniform* methods, *id.* at 694, a principle that would be breached if the availability of an adequate non-adjusted benchmark for the Gulf Coast prevented the use of an adjusted benchmark for the West Coast. See also *Exxon,* 182 F.3d at 38 ("[W]e did not remand because the old method was inaccurate, but because it was unfairly nonuniform.").

Despite the Commission's claims to the contrary, its decision to use the Gulf Coast price for West Coast deliveries of naphtha appears to have been based at least in part on the now abandoned No Adjustment Policy. Indeed even its brief invokes the benefits of making no adjustments. See Respondents' Br. at 13. And the Intervenors admit that the Commission declined to adopt a formula based on West Coast gasoline prices for naphtha because it did not want to assume "the risk that the formulas the parties proposed would be manipulated in some fashion to favor one party over another." Intervenors' Br. at 26. Even on a narrow view of *OXY*'s impact on the No Adjustment Policy, the changes in the Gulf Coast naphtha market improve the trade-off for using an adjusted price rather than one from the dwindling Gulf Coast market.

Third, Tesoro presents evidence that appears to show a large disparity between the Commission's valuation and the true value of West Coast naphtha. According to Mr. Stancil, an engineer and energy consultant, the quoted Gulf Coast naphtha price in December 1996 ($26.38 per barrel) undervalued West Coast deliveries by $2.71 per barrel.[6] This alleged disparity dwarfs the ones that required remand in *OXY.* See 81 FERC at 62,462 (revising valuation of light distillate by $0.005 per gallon, or $0.21 per barrel, after *OXY* remand).

These three propositions may well be answerable by the Commission. But without an adequate Commission response, they at the least establish a prima facie case that new evidence warrants re-examination of how West Coast naphtha should be valued.

■ Tesoro also challenges the valuation of the VGO cut. In its original decision on the distillation method, the Commission found that illiquidity in the West Coast market required it to use Gulf Coast prices for West Coast VGO. 67 FERC at 61,531. Tesoro suggests that because the Commission later found the West Coast NGL market, which is allegedly *less* liquid than the West Coast VGO market, to be sufficiently liquid to be used for NGL cuts, the Commission should also use West Coast VGO prices for West Coast VGO.

The Commission provides two responses. The first is plainly inadequate. The Commission says that it considered Tesoro's evidence in 1998 in evaluating—and rejecting—a proposal to change the valuation of West Coast VGO because of a change in how Gulf Coast VGO prices were being reported. 82 FERC ¶ 61,343 (1998). See also *Tesoro Decision,* 87 FERC at 61,519 (citing the 1998 decision). But when Tesoro sought review of the resulting order in this court, the Commission moved—successfully—for dismissal of the petition for review on the ground that the order was non-final. Petitioners' Br. at App. A. Agencies may not use shell games to elude review. See *AT&T Co. v.*

---

**6.** Using adjusted gasoline prices, Stancil claims that West Coast naphtha is worth

$29.09 per barrel. See J.A. at 1001.

*Federal Communications Commission,* 978 F.2d 727, 731–32 (D.C.Cir.1992).

Second, the Commission argues that in its decision to use the West Coast NGL market another factor was in play—differences between the coasts' petrochemical industries and consequently their demand for NGLs—that is apparently inapplicable to VGO. That much is true. In approving a switch to reliance on the West Coast market for West Coast NGLs in 1998, it reasoned that the higher demand for NGLs on the Gulf Coast made it a less reliable standard for West Coast NGLs than the West Coast market, despite the latter's illiquidity. 81 FERC at 62,466. But Tesoro's argument is more subtle. It is that the switch to reliance on the illiquid West Coast NGL prices reflects a liberalization in the Commission's liquidity standards.

To this the Commission's reply is that it has no "generic standards for liquidity." Respondents' Br. at 57. Thus the 1998 decision on NGLs could not have reflected a change in such standards. But the answer is illogical. Clearly the Commission regards illiquidity as a *factor* weighing against the use of a possible benchmark. When it changed its position in 1998 to allow use of the illiquid West Coast market it invoked disparities between the Gulf and West Coast markets, but it never asserted that there has been a *change* in those disparities. Accordingly, Tesoro's inference that the NGL change reflects a reduced Commission anxiety about illiquidity is hardly unfair. Of course it may be that for VGO the Commission might reasonably find the balance to tilt more strongly in favor of Gulf Coast prices, so that Tesoro's claim will ultimately lose. But Tesoro has shown enough to get its foot in the door, entitling it to an attempt to persuade the Commission to make a different trade-off on VGO.

\* \* \*

 Whether or not Exxon's ultimate goal is to resurrect the gravity method in

some form (a matter the parties dispute), its evidence at least suggests changed circumstances regarding the reasonableness of the distillation methodology. Tesoro has also supported its prima facie case about the valuation of the naphtha and VGO cuts. The Commission's failure to respond meaningfully to the evidence renders its decisions arbitrary and capricious. Unless an agency answers objections that on their face appear legitimate, its decision can hardly be said to be reasoned. *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 648 (D.C.Cir.1973); see also *City of Vernon v. FERC,* 845 F.2d 1042, 1048 (D.C.Cir.1988).

\* \* \*

Exxon in a footnote arguably challenges the Commission's observation that "changes in the quality bank would be on a prospective basis, and no damages awarded." *Exxon Decision,* 87 FERC at 61,524 n.28 (cited in Petitioners' Br. at 10–11 n.8). The issue appears premature, as there has yet been no finding that the prevailing methodology is not just and reasonable. Presumably the availability of damages turns in the first instance on the applicable statutory language. See, e.g., 49 U.S.C.App. § 15(1)(1988) ("Whenever, after full hearing, upon a complaint made as provided in section 13 [of the Interstate Commerce Act] … the Commission shall be of opinion that any … rate … is or will be unjust or unreasonable …, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable … rate … to be thereafter followed…."). See also 49 U.S.C.App. § 13(2) (1988) (withholding authority to make "orders for the payment of money" under this section); 49 U.S.C.App. § 15(7) (1988) (providing for Commission suspension of *carrier-filed* rate schedules pending hearing, and for refunds when the rate issues are resolved); cf. *OXY,* 64 F.3d at 698–700. But see *Exxon,* 182 F.3d at 49–50. Because the claim is premature, we do not address it.

* * *

The absence of a reasoned Commission explanation requires us to reverse and remand the case for further proceedings.

*So ordered.*